**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF PREMISES AT 27 MEETINGHOUSE ROAD IN BIDDEFORD | No. 2:24-mj-179-KFW <br><br> FILED UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Thomas Lapierre, being duly sworn, state:

*INTRODUCTION AND AGENT BACKGROUND*

1.  I am a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA") and have been since 2007. I am presently assigned to the Portland, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c). During my time as a TFO with the DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in

1

the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

2.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for a residence located at 27 Meetinghouse Road in Biddeford, Maine (the "Subject Premises") as well as any cellular telephones found at the Subject Premises or in the possession of known occupants of the Subject Premises (collectively "Subject Devices"), all as more particularly described in Attachment A of this Affidavit, for contraband and evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846, 843, and 841, 18 U.S.C. § 924(c), and 18 U.S.C. § 922(g)(3) ("Target Crimes"), as more particularly described in Attachment B of this Affidavit. The applied-for warrant would authorize forensic examination of the Subject Devices for the purpose of identifying electronically stored data described in Attachment B. It would also authorize biometric scanning in order to access that data.

3.     Based on the facts set forth in this affidavit, there is probable cause to believe that the Target Crimes have been committed by one or more individuals using the Subject Premises as a residence. There is also probable cause to believe that the Subject Premises will contain Subject Devices and other contraband, evidence, and fruits and instrumentalities of the Target Crimes. Furthermore, there is probable cause that the Subject Devices contain evidence of one or more Target Crime.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

## PROBABLE CAUSE

5. The DEA is investigating drug trafficking activities and a drug-trafficking-related shooting incident involving the Subject Premises and residents thereof. Based largely on information developed by officers with the Biddeford Police Department (BPD), there is probable cause that Patrick McCarthy—who resides at the Subject Premises—shot one of his drug customers on May 28, 2024, and that evidence of that event and of drug trafficking from the Subject Premises will be found at the Subject Premises and on the Subject Devices.

### *Background and Prior Search*

6. At approximately 3:30 a.m. on May 28, 2024, BPD responded to the Subject Premises based on a 911 call made by resident Brian Trombley. Trombley—a second floor resident of the Subject Premises—reported hearing multiple gunshots from the first floor of the building, as well as yelling and screaming. BPD Officer Jacob Garza arrived and observed a male in shorts walking on Meetinghouse Road, approximately 50 yards from the Subject Premises. The male was subsequently identified as Patrick McCarthy, a first-floor resident of the Subject Premises. McCarthy at that point reported a male, whom he did not know, attempted to force entry into the first floor of his residence at 27 Meetinghouse Road. He reported that this male forced the door open, which injured a third resident of the Subject Premises named Robert Marek. McCarthy further reported he heard gunshots, and the unknown intruder fled from the residence.

7.      Following these statements, officers entered the Subject Premises. In the area of a south-facing door they located suspected blood and inside the residence observed a spent shell casing and a live round of ammunition. Robert Marek was present and interviewed. He ultimately reported an unknown male attempted to enter the residence and McCarthy fired multiple rounds at the individual.

8.      At approximately 4:15 a.m., an individual called 911 from an address on Hill Street in Biddeford, and then reported it was an accidental dial. An officer with the Saco Police Department (SPD) responded nonetheless and found residents cleaning up suspected blood at the address. In interviews with residents there, officers were told that John Doe had arrived at that address with a gunshot wound and had been transported to a local hospital by Jane Doe. A subject at the Hill Street address reported John Doe had entered with a gunshot wound and had been with another unknown male at the time.

9.      Portland Police Department officers confirmed that John Doe was at that hospital and a vehicle belonging to Jane Doe was there as well and appeared to have blood inside of it. Officers responded and confirmed that John Doe was at that hospital and had a least one gunshot wound to his neck area. John Doe at that point refused to provide information about the shooting. Jane Doe was present and said she had been at the Hill Street address when she woke to John Doe yelling that he had been shot. She said John Doe wanted to go to a hospital in Portland because if he went to Biddeford he would be put in jail.

10.     Detectives with BPD responded to the Subject Premises. They spoke to McCarthy. In this interview he stated he had lived at the residence approximately two

4

months and that night had heard noises that sounded like someone trying to force entry into the residence. He stated he and Robert Marek were both at the front door and an unknown male tried to enter with a knife. McCarthy said he punched the male and then heard multiple gunshots but claimed not to have seen a firearm. The detectives also spoke to Robert Marek. He stated an unknown male had tried to force entry into the residence and in doing had struck Marek with the door. He appeared to have an injury near his left eye. Marek too said he heard gunshots but did not see any firearms. Marek stated he used crack cocaine and there would be evidence of drug use in the residence. He stated he had been living at the Subject Premises approximately 30 years. He stated the residence is technically a single-family residence but there are upstairs and downstairs residents. When further questioned, Marek stated he had actually seen McCarthy shoot the unknown male from inside the apartment. He also stated that the upstairs tenants, Brian Trombley and Kallie Bryant, had been involved.

11. Kallie Bryant was present and interviewed. She stated she lived in the upstairs area of the Subject Premises with Brian Trombley. She said she heard gunshots and someone yelling and had no other information. Meaghan Hebert was also present at the Subject Premises. She said she had been staying there with McCarthy for two weeks. She said she hid in the bathroom during the incident, heard multiple gunshots, and then jumped out of a window.

12. Officers observed blood and what appeared to be torn clothing at the residence. There were also multiple holes that appeared to be bullet holes inside the residence. There was also one shell casing and one live round in the kitchen area of the residence. Suspected drug paraphernalia was also observed. There was no substantial

5

damage to the entry door through which the unknown intruder had reportedly forced entry.

13. Patrick McCarthy was then interviewed again. He again claimed not to have fired a gun during the incident. He was told that he was not under arrest and was not being accused of a crime and that a person can defend himself and others if someone is breaking into his residence. McCarthy then said an unknown male showed up with a large knife and demanded money. McCarthy said he had punched the male, who left. Then the male returned and tried to force his way into the residence. McCarthy then said he grabbed a firearm he thought belonged to Marek and shot the unknown male, who fled. He led detectives to the rear of the residence and stated he threw the firearm into foliage near the residence.

14. Based on this and additional information, the Subject Premises were secured on May 28, 2024, pending application for a search warrant. Detective Adam Hubbard with the BPD applied for and obtained a state search warrant to search the Subject Premises, including vehicles at the scene registered to Marek and McCarthy. This warrant authorized law enforcement to search for and seize a number of items, including drugs and drug paraphernalia.

15. The Subject Premises were searched on May 28, 2024. Officers recovered a 9mm Taurus handgun behind the Subject Premises, in the vicinity where McCarthy claimed to have thrown a handgun. Other items recovered included two 9mm casings and one 9mm live round. Officers also recovered suspected controlled substances that were found in a small room on the first floor. A suspected "ledger" for keeping track of monetary transactions was located and photographed—but not seized—in a room

associated with McCarthy. That ledger referenced Cashapp, an application that allows users to transfer money electronically. Drug paraphernalia was observed on both the first and second floor of the Subject Premises. Two cellular phones were observed but not seized in the room associated with McCarthy. A safe was located in an upstairs room that also contained paperwork in Trombley's name. Trombley claimed not to know the combination to this safe but claimed it was empty. It was moved and lifted to determine if anything was inside and there was no indication it contained anything of significant size. It was not seized or further searched.

16. During this search officers' primary focus was to document the crime scene as it related to the shooting. Therefore, several items that, in my training and experience, may constitute evidence of the Target Crimes, such as cellular phones, a ledger, a safe, and drug paraphernalia, were not seized for further examination at that time.

*Subsequent Information from John Doe[1]*

17. On May 29, 2024, John Doe contacted the BPD from the hospital and expressed a desire to talk about the incident. Detectives went to the hospital where he continued to receive treatment for his injuries.[2] He stated that on May 28th he had been under the influence of drugs and looking for more drugs. He believed he was in

---

[1] John Doe has a felony criminal history. He has multiple felony theft convictions. He also has a prior federal drug trafficking conviction in 2011. He also has a lengthy misdemeanor record, including charges for violating bail, theft by deception, and violating bail conditions.

[2] This summary is a summary of BPD's summation of this interview, which was audio and video recorded. Like other information contained in this affidavit, this summary is based on information provided to me. I have not personally reviewed the recording of the interview.

Saco near Cumberland Farms but was not certain of his location. Two males in a vehicle asked if he wanted drugs and entered the vehicle. They drove him to an area in Biddeford. He said he was seated in the rear of the vehicle and the front male passenger appeared to be using a phone to send text messages as they drove. The description he gave for this passenger, while not detailed, was generally consistent with the physical description of Brian Trombley. John Doe provided that male with $200 in cash for cocaine and heroin. That male entered a residence and then returned to the vehicle and provided drugs to John Doe. John Doe believed he had been provided less drugs than had been negotiated and he and the same male then entered the residence so he could discuss with the provider of the drugs how John Doe felt he had paid for more drugs than he received. He stated that, inside the residence, there was an older male, a blond female, and a "Hispanic" or "Indian" male who he identified as the drug dealer. An argument ensued with that male and John Doe pushed the dealer. The dealer then began walking to another part of the residence. John Doe saw him reach down with his hand. John Doe reached into his waistband for a knife he had concealed and then saw a flash and heard the sound of gunfire. He fell to the floor. He lay on the floor and heard people conversing about what to do with him and he was then dragged onto the porch. From there he was able to move himself back to the vehicle he had arrived in, where the same male driver was still seated. John Doe stated at some point while they were driving, he realized he knew he was near his girlfriend's sister's house and that same driver was willing to transport him to that residence. His girlfriend, Jane Doe, then drove him from there to the hospital. He reported someone at the residence had called 911, but he had urged them not to report it for fear of police involvement.

18. A BPD detective involved in the search of the Subject Premises and with this interview noted that several parts of John Doe's description of the location of the shooting and description of the occupants at that location were generally consistent with the Subject Premises and known occupants.

*Additional Information and Pertinent Officer Experience*

19. On May 29, 2024, Detectives with BPD contacted McCarthy at the Subject Premises to obtain a DNA buccal swab. Upon arrival, Robert Marek greeted officers and initially denied that McCarthy was at the residence. He then admitted McCarthy was present and McCarthy was observed with a phone. That phone was not seized.

20. McCarthy's criminal history was reviewed. It showed an arrest for unlawful possession of fentanyl powder on March 5, 2024, involving SPD. SPD was contacted by BPD about this incident and advised that the incident involved an incident where McCarthy was found in a vehicle with Brian Trombley, Meagan Hebert, and Robert Marek and that there was suspected fentanyl powder in the vehicle.

21. A neighbor of the Subject Premises was contacted regarding the shooting incident. This neighbor reported having seen an increase in the number of people coming and going from the Subject Premises during the month prior to the shooting. The neighbor also described seeing what the neighbor believed to be hand-to-hand transactions between people at the front entrance to the Subject Premises. Based on my training and experience, this description is generally consistent with drug trafficking activity being conducted from a residence, which frequently involves noticeable foot and vehicle traffic.

22. Several suspected cellular phone numbers of individuals who reside at the Subject Premises have been identified via public record searches and information in databases available to law enforcement. A T-Mobile cellular phone number has been associated with Marek. A different T-Mobile cellular phone number has been associated with Brian Trombley. Three separate Verizon cellular phone numbers have been associated with Patrick McCarthy. One of those numbers has also been associated with a CashApp account under the account name "Patrick McCarthy."

23. I know that cellular phones are a common method of communication, not only among those involved in selling and purchasing controlled substances, but also among friends and cohabitants. I also know that many cell phones can now function essentially as small computers, with capabilities that include serving as a wireless telephone to make calls, digital cameras, portable media players GPS navigation systems, sending and receiving text messages and emails, accessing the internet, and accessing additional messenger applications and programs. They can store a range of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

24. I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription. Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop

computer. Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone"). The percentage of adults that own a smartphone is even higher among younger demographic groups: 96 percent of 18–29-year-olds, 92 percent of 30–49-year-olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

25. I submit that if a cellular phone is found at the Subject Premises, there is probable cause to believe records referenced above will be stored on that cellular phone. For example, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium (such as a phone) deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file from a device such as a cell phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Likewise, people

frequently do not delete text messages or other communications sent from their phones.

26. As further described in Attachment B, this application seeks permission to locate not only files on cellular phones that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how cell phones were used, the purpose of their use, who used them, and when.

27. Based upon my training and experience and the facts of this investigation, there appears to be a familiarity and multi-month relationship between occupants of the Subject Premises. Furthermore, given the common use of cellular phones described above, and the specific evidence that multiple subjects from the Subject Premises use cellular phones, I believe it is likely that occupants of the Subject Premises have communications sent or received on cellular devices related to the shooting incident described above. Such communications would provide evidence of how that event transpired. Further, I believe it is likely that the occupants have communications related to other drug use and distribution activities, spanning at least as far back as March of 2024. I also believe it is likely that the occupants have communications related to drug use and or firearm use or possession, which would constitute evidence of unlawful possession of a firearm or ammunition by an unlawful drug user.

28. Law enforcement agents will endeavor to search and seize only the cell phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If,

however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

29. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying cell phones that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30. I am also seeking authority to obtain from occupants of the Subject Premises the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock Subject Devices. I seek this authority because I know that most cellular phone manufacturers now offer users the ability to unlock devices through these types of biometric features in lieu of other passwords or codes. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprint. Similarly, if a device is equipped with facial recognition, a user may enable the ability to unlock the device through his or her face. In my experience, users of cellular phones often enable these types of biometric features as a convenient way of unlocking a device. Passwords or codes to unlock the Subject Devices, meanwhile, may not otherwise be available to law enforcement, making use of biometric features necessary to effectively and

efficiently execute the warrant. Thus the warrant sought would permit law enforcement to press or swipe the fingers or thumbs of occupants of the Subject Premises to a fingerprint scanner of the Subject Devices and or hold the Subject Devices in front of the face of occupants to activate facial recognition features, for the purpose of unlocking Subject Devices.

## CONCLUSION

31. I respectfully request that the Court authorize DEA special agents or task force officers or their authorized representatives, including, but not limited to, other law enforcement agents and technicians assisting in the above-described investigation, to search the Subject Premises for Subject Devices and other items identified in Attachment B, and to search the Subject Devices, also as identified in Attachment B.

Respectfully submitted,

_____
Thomas Lapierre
TFO, U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: May 31 2024

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title

14